INTERSTATE GENERAL CORP., peticionaria, *v.* LIDUVINA SOTO MATÍAS, LUIS S. ANGUEIRA RIVERA y DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR, recurridos.

Número: O-82-440      Resuelto: 19 de octubre de 1982

*Jorge Calero Blanco,* de *Nigaglioni, Palou & Ledesma,* abogado de la peticionaria; *Juan F. Pagani-Rodríguez,* abogado de los recurridos Soto Matías y Angueira Rivera; *Ángel M. Villamil,* abogado del recurrido Departamento de Asuntos del Consumidor.

PER CURIAM: El Señorial Homes, Inc. construyó y vendió una casa para el 28 de julio de 1972 a los esposos Suárez Castillo. Los esposos García adquirieron la residencia tiempo después y el 22 de septiembre de 1979 la vendieron a los recurridos. El 9 de noviembre de 1979 los recurridos se querellaron ante el Departamento de Asuntos del Consumidor ("DACO") contra Interstate General Corp., sucesora en interés de Señorial Homes y actual recurrente.

El 10 de septiembre de 1981 DACO determinó que la propiedad "adolece de los siguientes defectos de construcción: Filtraciones en el techo de la sala, cocina, pasillo y las habitaciones". DACO ordenó la reparación del defecto o el pago de la suma necesaria para su corrección. El Tribunal Superior confirmó la orden administrativa. Instada la correspondiente petición de *certiorari,* dictamos orden de mostrar causa por la cual no debe revocarse la sentencia emitida.

Los compradores en este caso tenían a su disposición la acción redhibitoria o la de *quanti minoris* contra sus vendedores inmediatos, conforme los preceptos del Art. 1373 del Código Civil, 31 L.P.R.A. sec. 3841. Al acudir a DACO aún estaban a tiempo para incoar, a su elección, cualquiera de ellas. No se les asesoró sobre este derecho o por alguna razón los compradores resolvieron no ejercerlo. Se apoyaron en vez exclusivamente en la acción decenal contra el contratista, Art. 1483 del Código Civil, 31 L.P.R.A. sec. 4124. Tal

curso de acción presenta serias dificultades en el caso actual.

Según señalamos en *Maldonado Pérez* v. *Las Vegas Dev.*, 111 D.P.R. 573, 578, 579 (1981), el Art. 10(j) del reglamento de DACO para regir el negocio de la construcción de viviendas privadas, 17 R.&R.P.R. 503-19, en vigor para la fecha en que se presentó la querella original, "enumera una larga serie de defectos de construcción y especifica el término en que deberá notificarse al contratista o al urbanizador. . . . El reglamento es . . . de especial importancia para guiar la discreción judicial en la apreciación de la gravedad del defecto. El Art. 10(j) se formuló claramente 'tomando como base los principios técnicos de ingeniería, tipo, clase y/o [*sic*] método de construcción' . . .".

El Art. 10(j)(12) del referido reglamento trata específicamente el asunto de las filtraciones en los techos y exige la notificación del defecto al contratista dentro de dos años a partir del otorgamiento de la escritura de la primera compraventa. Aquí la notificación ocurre más de siete años después.

Conforme las normas establecidas en *Maldonado Pérez* para precisar si ha ocurrido la "ruina" a que alude el Art. 1483 debe examinarse la gravedad del defecto y el tiempo de su aparición. La propia apreciación en su reglamento por el organismo administrativo especializado de los diferentes términos de notificación a utilizarse en el caso de vicios distintos, aunque no totalmente determinante, necesariamente afecta el análisis de lo que constituye un estado ruinoso en situaciones específicas. Si ha expirado el término reglamentario tiene que desfilar prueba demostrativa de que el defecto es de tal gravedad que su aparición para el tiempo en que se revela excede la medida de lo permisible técnicamente. El defecto, como es natural, tiene que deberse a un vicio de construcción o diseño. La determinación administrativa sobre estos extremos debe fundarse en prueba sustancial. Art. 17 de la Ley Núm. 5 de 23 de

abril de 1973 (3 L.P.R.A. sec. 341p). Las circunstancias de este caso no nos persuaden que deba extenderse a las filtraciones ocurridas en este caso la responsabilidad decenal.

La transcripción de la prueba presentada en la vista ante DACO revela lo siguiente. La co-querellante, señora Soto Matías, describió las goteras que advirtió al tiempo de mudarse a su nueva casa. Expresó que, al inspeccionarla, "la propiedad estaba en muy buenas condiciones". (T.E., pág. 3.) La vivienda estuvo sin ocupar por algunas semanas después de la compra por ella y su esposo y antes de mudarse. Advirtió las filtraciones en diversos sitios de la casa al llover copiosamente.

Luego declaró el esposo. Éste explicó, respecto a las goteras, "que hay algunas que salen y después dejan de caer momentáneamente, esporádicamente sale una en un sitio y esa otra vez no sigue cayendo, por temporada. No sé por qué es, a veces sale, va cayendo esa, entonces nosotros ponemos un balde para recogerla o algo y a veces caen goteras ahí y a veces no, o sea, no siempre en esos sitios". (T.E., pág. 12.)

A continuación testificó el perito de DACO, quien admitió no ser ingeniero. Señaló que observó filtraciones en el techo de la sala, la cocina, el pasillo y las habitaciones. Observó que el techo era del tipo tirado a base de brea y piedra y fabricado con losas. Añadió que "pude observar que las filtraciones provienen donde une una losa con la otra" (T.E., pág. 26), aunque admitió que en ningún momento le enseñaron a determinar las causas de las filtraciones. (T.E., pág. 23.) Finalmente se le preguntó al perito de DACO:

Mire, usted pudo llegar a una determinación de si la casa habían [*sic*] defectos de construcción?

R. ¿Que si habían [*sic*] defectos de construcción? No señor.

P. No. ¿No habían [*sic*] defectos de construcción?

R. No, defectos de construcción no [había ninguno].

[T.E., pág. 30.]

.    .    .    .    .    .    .    .

Yo le pregunto entonces a usted si hizo alguna [*sic*] esfuerzo para determinar las causas de las filtraciones?

R.  No, no hice, no. . . . [T.E., pág. 31.]

La pregunta final fue:

Le pregunto si el estado que presentaba ese "built up roofing" si es el estado normal que tendría uno después del tiempo que lleva construído.

R.  Sí. [T.E., pág. 37.]

La querellada presentó como testigo al Ingeniero Prado. El Ingeniero Prado distinguió entre distintos tipos de filtraciones. Explicó que cuando una propiedad está desocupada ocurren grandes variantes en la temperatura y que en cualquier propiedad en nuestro clima ello puede causar filtraciones. Añadió que la instalación de antenas, el tipò de mantenimiento y otros factores pueden ocasionar el fenómeno. Añadió que lo que observó en este caso fueron manchas de humedad, hilos de humedad causados por las condiciones climatológicas del país. (T.E., pág. 48.)

Se habrán advertido las graves deficiencias de esta prueba para cumplir con el requisito estatutario de que la determinación administrativa esté respaldada por evidencia sustancial. El testimonio del propio perito de DACO es extremadamente débil y aun perjudicial al interés de los consumidores envueltos. El perito admitió no haber intentado determinar la causa de las filtraciones, expuso que el techo se hallaba en estado normal para un techo de su antigüedad, y aun concluyó que no había "defectos de construcción". No se hizo esfuerzo alguno por refutar el testimonio pericial presentado por la querellada. Por haber expirado el plazo reglamentario de dos años era particularmente importante rebatir el testimonio pericial de la querellada con prueba técnica demostrativa de la existencia de los elementos señalados en *Maldonado Pérez.*

■ Lo anterior no significa en modo alguno que las filtraciones quedan fuera del palio de toda protección. Lo que ilustra este caso tan particular es que, en cuanta ocasión quepa, como aquí, el consumidor debe ser asesorado para que incoe simultáneamente una acción redhibitoria o estimatoria; que el reglamento actual de DACO señala unos requisitos que deben observarse, y que, al expirar el plazo reglamentario, la gravedad del defecto, la relación causal con acto alguno del contratista y el tiempo de la aparición del defecto son factores que tienen que aquilatarse a la luz de la prueba disponible.

En un plano más amplio debemos observar que el equivalente de nuestro Art. 1483 ha sido objeto de reforma en diversos países. Se ha intentado lograr un nuevo equilibrio entre el interés público a la luz de las realidades cambiantes de cada sociedad. La tarea es compleja y mucho más abordable por el poder legislativo y el proceso administrativo que por el poder judicial. La Asamblea Legislativa quizás estime prudente reexaminar este asunto, cuestión que exigirá por fuerza detenido estudio, o, mientras tanto, quizás el Departamento de Asuntos del Consumidor considere aconsejable alterar su reglamento, dentro del marco de autoridad que se le ha delegado, de pensar que las normas vigentes deben modificarse para fijar plazos más amplios.

*Por las consideraciones expuestas se expedirá el auto y se revocará la sentencia recurrida.*